Second and final case this afternoon is number 18-1638, St. Regis Mohawk Tribe v. Mylan Pharmaceuticals Inc. Mr. Massey. Thank you, Your Honor. May it please the Court, Jonathan Massey for the appellants, and with me at council table is Marcia Schmidt, representing the St. Regis Mohawk Tribe. With the Court's permission, I'd like to ask for five minutes for rebuttal. Our position is that tribal immunity in the IPRs is the logical conclusion of the system enacted by Congress. In creating IPRs in 2011, Congress deliberately chose an adversarial adjudicatory party-based model for IPRs rather than the agency-led inquisitorial model of reexaminations. The SAS Court made that clear. Congress chose a model that the Supreme Court and this Court had recognized would trigger sovereign immunity. Doesn't the Supreme Court case in all states undermine your position? I mean, in all states, first of all, they decided that a patent is a public franchise, right? Correct. And also the Court went on to say that when a patent is granted, it's granted with the expectation that it could be subject to review, even cancellation. That's right. And it's given the government the authority to do just that. Well, it's given the government the authority to do it with respect to every patent. The question is, does it trigger sovereign immunity? We don't disagree with anything in oil states. We actually think it supports our position because it recognizes that IPRs are a court-like, that's the phrase the Court used, a court-like procedure before an adjudicatory body composed of judges. It said that it wasn't a form of the judicial power for purposes of Article III. We agree with that. There's no Article III violation. There's no Seventh Amendment violation, as Judge Wright noted. But there are very significant differences between an IPR and a suit before a federal court. Well, there are differences, but the question, there were differences as well in FMC and in VASCAP, differences between interferences and federal court suits. A director had to declare an interference in VASCAP. It wasn't filed like a normal federal civil action. In FMC, there was an administrative adjudication that bore a lot of differences from federal courts. For example, FMC could not even enforce its own order. It had to go to the Attorney General. So while an IPR can cancel a patent's validity, the FMC decision had no effect. It had to rely on the Attorney General to enforce it. The FMC proceedings also weren't triggered automatically. The FMC proceedings occurred when a complaint was received. Then the FMC had to make a decision whether the complaint had been satisfied. It was ordered by statute, which is 1710 subsection B. But FMC makes clear that there's nothing wrong with starting a proceeding that's initiated by a private party. It says that very explicitly. That's correct. It didn't tarry over the question, how exactly was this commenced? And it's the same, I think, SAS makes clear here. That even though an IPR, the director plays a role in instituting the IPR, and thereafter plays no role. I mean, there's no participation by the PTO solicitor or the director in the IPR. Well, unless the petitioner withdraws. Well, but even then, the PTO solicitor doesn't come in and take over the prosecution. The panel just handles the case. That happens in the FMC situation as well. In FMC, if the respondent didn't show up, the rules provided that an adverse judgment could be entered, or the investigation could continue. And the FMC could continue with the proceeding. But I think the main point I want to make is that the Article III question is not the same as the sovereign immunity question. That we're not arguing that there's a violation of Article III, which is what oil states was concerned with. No, but what we're trying to do is to decide whether tribal immunity applies in this hybrid type of proceeding. This proceeding has many of the trappings of civil litigation, as you've eloquently articulated in your briefs. But at heart, it is reconsideration of the PTO's own prior grant. So is it enforcement action when it's really just a reconsideration, as oil state says, of the PTO grant? Or is it more like civil litigation between two parties where both parties have something at stake? And both parties don't have something at stake in this case. Only the patentee has something at stake in the IPR context. And it's the reconsideration of a prior grant. So I understand all the reasons you've articulated for why this is like a civil litigation. And Justice Gorsuch certainly helped you a lot by three separate places analogizing it to civil litigation. But then the majority in oil states didn't help you, and he's in the dissent. By the way, those two cases really come to loggerheads here in this exact instance for us, I think, because it's a hybrid proceeding. So which side of the line does it fall on and why? Right. Well, I think Congress made that decision in 2011. I mean, the House report made clear that it was a significant change in approach, right? The House report says on— You can't say Congress made this decision. Congress didn't speak to tribal immunity anywhere in this statute. So for you to come in and to suggest to me that Congress decided this case in 2011 is nonsense. No, no. No. What I'm saying is Congress deliberately chose an adjudicative model. It said, the House report says, and this is Blue Brief, page 21, we wanted to—Congress decided, quote, to convert? I'm sorry. I don't care what the House report says. And if you knew anything about me, you'd know that. But beyond that, you've got Supreme Court justice saying it three times over. You don't need to rely on some House report. We've got to follow them. I don't have to follow a House report. Right. But I do have to follow the Supreme Court. So you're on better footing telling me what the Supreme Court said than you are, what some random House report said, which is not the law. That's correct. Oh, I agree. I just—let's talk about what the Supreme Court said. Because I think in FMC, there were the same public rights arguments, the same Article III arguments, and the court didn't even address it. It didn't even—Justice Stevenson Breyer didn't even argue that in dissent. The majority dropped a footnote, footnote 11, in FMC, made clear that an administrative adjudication raises more sovereign immunity concerns than a court proceeding would, and the fact that it involved a public right didn't make any difference. We concede that reexamination would not trigger sovereign immunity. If you have an inquisitorial, agency-led model, that does not trigger sovereign immunity. Even inter-parties reexam? Inter-parties—well, yes. We would say that that was still on the line of inquisitorial, examinational, no sovereign immunity. And in fact, in this case, the director could convert all IPRs against sovereigns into ex parte reexams. I mean, anyone can institute an ex parte reexam at any time. The director could deem these all to raise substantial new questions of patentability and institute ex parte reexams. That would be permissible under our view. And what's the difference between ex parte reexam and this, that puts this on the other side of the line? Well, they're entirely inquisitorial. Once the party requests, the ex parte— So the key difference is there's no participation by the private party? Right. There's no participation. The ex parte reexam is undertaken by the examiner, so the reexaminer, just like the regular patent process, there's a dialogue between the examiner and the applicant and the owner, and the proceeding proceeds through that dialogue. There's no role for an independent third party. Here, not only is there a third party— That's why I asked even inter parte reexam, because there was a role, when it existed prior to IPRs, there was a role for third parties to play in that process. Do you still maintain the same answer, that yes, inter parte reexam would have been something where the tribe doesn't have sovereign immunity? Because your answer to Judge Dyke is no, because— That's only one factor, obviously. The fact that there was a role for the third party, but it wasn't significant enough, that's why Congress changed it in 2011. And not only is it just that the third party starts the reexam, I mean, starts the IPR, the third party sets all the bounds of the IPR. The only arguments the PTAP can consider are the arguments and evidence of the parties in the IPR. What about a 337 proceeding? Which side of the line would that fall on? Well, I don't know. We'd have to look at each of the facts in these cases. And there are—the trappings include, I think FMC was clear, and Discord and BASCAP, listed the factors to consider. If something's governed by the federal civil procedure rules, if it's governed by the federal rules of evidence, does it have— It isn't governed by the federal rules of civil procedure. Well, it looks to it. For example, in this case, they borrowed the indispensable party rules from the federal civil rules. There's a huge difference between the way IPRs are conducted and the way a trial is conducted in a district court. Of course, and so is FMC. FMC didn't proceed like a courtroom proceeding. It had depositions. It had a hearing. FMC was much less adjudicatory, frankly. It was a harder case than this case. The FMC had one small role of adjudication. It was a policymaking, rulemaking, investigatory body. And it took the position before the Supreme Court, if you look at the government's briefs in the FMC case, it said, we just use adjudications to develop evidence so we can understand— So what happens in a case, in a trial case, what happens when the petitioner or the claimant abandons a case? In an IPR? No. Oh, I'm sorry. In a judicial proceeding. In a judicial proceeding, right. A default judgment can be entered against the party. Or the case is terminated, right? I mean, it comes to an end. Yes, that is true. That doesn't happen in an IPR. It doesn't happen. It can or it may— You don't have to have either the patentee or the petitioner present in the IPR. Well, you do to start. You can't have an IPR starting without the patent owner being served with the petition. The petitioner has to start the IPR. Then it's true. The parties can drop out. Same was true in FMC. That did not stop the Supreme Court from— In a judicial proceeding, we look at the complaint. We look at the allegations in order to determine whether a proper claim has been stated. But that's not the case in an IPR, right? I mean, it's the director and the director alone that decides whether to institute. That is correct. That same thing was true in interferences in VASCAP. And it actually was true in the FMC case. But that—and I think the SAS Court made clear that the director's role in instituting does not change the nature of the proceeding from essentially an adjudicatory adversarial party-based system. That's all what Justice Gorsuch said in SAS. I don't think it's fair to say— How can it be adjudicatory or adversarial if there's no parties involved? Well, there are the parties to start with. And if one drops out and abandons the case, it is just essentially like the FMC proceeding. It's still adjudicatory. The nature of the case is still an adjudicatory dispute between parties. That's what inter-parties review means. Between the parties. It's not an agency-led proceeding. Didn't you waive immunity when you appeared in the Eastern District, a Texas case? And then also when you moved to enter the IPR? Well, the IPR was made—a special appearance was made in the IPR preserving immunity. And the PTAB did not find that to be a waiver. The PTAB didn't find the other thing to be a waiver. What about the Eastern District? The Eastern District, no. Because appearing—this court has held three times in A123 systems, in TGIC communications, and in the biomedical patent management case, that appearing in one forum does not waive sovereign immunity in a different forum. And those are involved states where there's an infringement action. Have you sued on all six patents that are involved here? Did we sue on all six? We sued on—yes, and then we issued covenants not to sue on the basis of four. And so there were actually 13 claims involved in the Eastern District of Texas. And there are 157 claims involved in the IPR. That's one reason why, frankly, the tribe has substantial rights beyond what Allergan's rights are because the Allergan field— Did you sue in the Eastern District of Texas on all of the patents that were involved? Yes, and then Judge Bryson asked to winnow those down to 15 maximum. They would winnow down to 13. But yes, the patents are at issue. But the legal standard is different. And I think after Quazzo, it's impossible to say that the cases are the same proceeding because Quazzo says that an IPR and a district court proceeding can come to diametrically opposed conclusions as to the validity of a patent. And so if—and in addition to the three cases I mentioned before, the rules regarding tribal waivers are much more limited than state waivers. The Supreme Court has held in the Oklahoma Tax Commission against the Potawatomi tribe that the tribe did not waive its sovereign immunity against a counterclaim. And the Supreme Court later held in the Lupita's case that the state of Georgia did waive its sovereign immunity by removing a case from Georgia state court to federal court. The Lupita's expressly distinguished tribal immunity and said the rules for tribal waivers are narrower than the rules for state waivers. And we cite a case in the brief from the Contour Spa at the Hard Rock case, the 11th Circuit decision, saying that the Supreme Court has clearly recognized that tribal waivers are narrower than state waivers. And so Judge Bryson, when he reviewed the case, he noted great concern that it appeared that the arrangement between the tribe and Allergen was one of circumvention, designed only to circumvention. He doesn't have to address it. But after I had the opportunity to review the license itself and to look at the arrangements that you entered into, I can see why he said that. What's your response to that? Well, I mean, Judge Bryson also said, quote, this court has examined the documents provided by Allergen and regards the question as a close one. That's at page 4. Yeah, but what's the answer to the question? Right. Wait, wait, wait. Yeah. So did Allergen get anything out of this transaction other than a claim of sovereign immunity? Well, I think the question of why it entered or what its purpose is is a number. Okay. Could you answer the question, please? What did it get? It got the tribe's commitment to raise the sovereign immunity so that the patents would not be subject to third or fourth or fifth serial IPR. That's correct. But why isn't that circumvention? Well, I don't think that's circumvention because the question is, we believe that was the system created by Congress. Using that system is not circumvention. And the license that shows, actually, that Allergen retained substantial rights under this court's precedent. I mean, there are six features of license that I would like to call your court. Well, that's a different question than the substantial rights question. This is a question whether there was circumvention of the IPR process and deliberate circumvention of the IPR process by buying sovereign immunity or renting it. Since that appears to be the purpose of the transaction, isn't that problematic? No, I don't think so. Because if the system is such that pleading sovereign immunity will cause an exemption, that is the effect of sovereign immunity. But wouldn't we be allowing a system to grow where many companies, many pharmaceutical companies or other companies, can simply go back and do the same type of, enter into the same type of arrangements with an Indian tribe? Where does that leave the IPR process then? Well, as I said, there's always ex parte re-exam. The tribe is always required to bring a lawsuit for infringement. So the opposing party, unlike many instances of sovereign immunity, No, let's talk about the IPR process. Okay, the IPR process still has, in the IPR process, the tribe It would be circumvented. Well, it would be changed from an inter partes to an ex parte re-exam. But the question of sovereign immunity always has But that's not what the law contemplates. Well, it does because we think Congress enacted this in 2011. After nine years previously, the courts had made clear that if you create an administrative adjudication between private parties to enforce the federal statute, that will trigger sovereign immunity. And so if that's the system created by Congress, it's not a circumvention of it. If that's the case, why didn't Congress write into the AIA a immunity? Well, it didn't. Of course, it's considering it now. And that's where the ball belongs. I mean, the same arguments were made in Bay Mills and Kewa Tribe, change tribal immunity and commercial transactions. And in every instance, the court has said, this is Congress's job to change the law if it wants to. It's not the court's job to narrow sovereign immunity. And the default rule is tribal sovereign immunity. States can do the same thing. But it is our job to apply the law and to determine whether there is sovereign immunity. That is correct. But if under the law there is sovereign immunity, I don't think that calling it a circumvention changes the result. And states can do exactly what Your Honor has talked about. In the Covidian case, the PTAB rejected exactly the same arguments. It's pretty clear that there's a difference between Indian tribals of sovereign immunity with respect to states and with respect to the federal government. Well, but not in a way that matters. Both of them are common law. The federal government is what grants the immunity to begin with. Well, the federal government can abrogate the immunity. It's actually a common law immunity that predated the federal government. That's what Bay Mills and Kewa Tribe said. And I think that the fact that Congress can abrogate means Congress's job, that just highlights my point, Congress's job here is to balance tribal immunity against other social factors. And it will do that in this area. The Blue Brief points out that those proposals are currently pending. But as I was saying, states can do exactly what Your Honor is saying. And the sovereign immunity always has that effect. And we cite in the Blue Brief. But what about the Colville case? I'm sorry. What about the Supreme Court's decision in the Colville case? In which case, I'm sorry? Colville. Colville, yes. Well, it said that that isn't about selling state taxes on cigarettes. And we accept that. Well, it disapproved the selling of sovereign immunity, right? Well, no. What it said is, in fact, the court has made clear in Kewa Tribe and Bay Mills and the Oklahoma Tax Commission, the state law may apply to cigarette sales on the reservation to non-members. But the state cannot enforce that law through a lawsuit against the tribe in court. Well, they can make the tribe collect those taxes. That's exactly the system we expect. In fact, we admit that we're governed by the patent laws, and they can be enforced on us by an agency, and they can be enforced on us when the tribe goes to court. The question is, can they be enforced through a private civil case that happens to be before the PTAB but bears all the trappings of a federal civil action? The answer is no. And Congress should have known that. If it didn't know it, it wasn't reading the decision in Vascaff and in FMC. So I would lay this problem not at your doorstep but at Congress's doorstep and say it's Congress's job to change if it doesn't like that system. With respect, if there are any more questions, I'll save a few minutes. We'll give you three minutes. Thank you very much. Mr. Miller. Good afternoon, and may it please the court. My name is Eric Miller, and I represent the Applebees. I'd like to begin with the question that you raised, Judge Moore, and that is how to draw the line between a proceeding that implicates immunity and one that does not, and that line is drawn in the Supreme Court's decision in Federal Maritime Commission. Sovereign immunity is a right not to be subject to suit at the behest of a private party, and the critical premise of the decision in Federal Maritime Commission  would be to answer the complaint of private parties in federal courts. It would equally offend their dignity to, quote, do exactly the same thing before the administrative tribunal of an agency, and there are a number of procedural differences between the kind of procedures in IPR and the kind that were at issue in FMC, and those are relevant, but there are really two critical distinctions that take this out of the rule articulated in FMC, and those two distinctions are how the process begins and what happens when it ends, and how the process begins in a civil lawsuit is with the filing of a complaint. In FMC it was with the filing of a complaint before the agency, and in neither of those cases the filing of the complaint hails the defendant into court or the Maritime Commission, and the adjudicator has no discretion but to adjudicate the complaint. There is going to be a case once the complaint is filed. But here it's quite similar. I mean, after SAS the director has almost no discretion. He doesn't have discretion to come up with his own grounds. He doesn't have discretion to refuse to address the grounds that were presented in the petition. He doesn't have the discretion to have a partial institution. The director has almost no discretion. His discretion is limited to institute or don't institute, and that's it. So why isn't this exactly like an adversarial proceeding adjudicating rights between private parties when the director has no discretion to pursue any grounds that he or she may think ought to result in the invalidation of this patent but is limited to the precise and only arguments raised by the petitioner in the petition? So why isn't this the adjudication of issues raised by one private party against another private party just being held in the forum of an administrative agency rather than a court? Because the one element of his discretion that you mentioned that he does have is critically important, and that is the discretion not to initiate the process at all. And he can only initiate it if he determines that there's a reasonable likelihood of success. But even if he does make that finding, he can choose for whatever reason. For administrative efficiency, not to institute at all. They don't have enough manpower to get through all these cases, especially now that they have to do everything in all of them. I get that. But why is that such a determinative factor? We're talking about tribal immunity. Do you think that there ought to be a thumb on the scale in favor of it? Do you think that there is a presumption that tribes have immunity outside of the context of civil litigation? No, there is not. How about in the context of civil litigation? Well, in the context of civil litigation, there's not a presumption that the law is that they have immunity in the context of civil litigation. So we have a hybrid proceeding, which the most recent case from the Supreme Court says in three separate places is effectively a civil litigation between parties. It's an adversarial proceeding between parties. What do we do with that? This is as far from an administrative enforcement action as I can imagine an administrative proceeding being. It is as close to civil litigation as I could imagine one being. Well, the discretion not to initiate the proceeding is important, and that's something that the Court emphasized in Federal Maritime Commission. It's something. I just don't know why it's so important. Tell me why that is so important because it's all you've got left now that SAS came out. Well, I mean, so at page 764 of the decision in Federal Maritime Commission, the Court emphasized that in that case, of course, the Maritime Commission had no discretion. And the Court said if they did have discretion, then there would be political accountability. If the tribe is asking or somebody is looking at the proceeding and asking why is the tribe here, why is this proceeding going on? I'm sorry, what page? 736? 764. There's a discussion of the political accountability considerations that would be present. On page 764, just so you know, I have absolutely nothing highlighted in my version, and practically all of FMC is highlighted. So what is it on 764 that's so important but obviously escaped my notice? Near the bottom of the page, the Court says, this is the second to last sentence, not counting the citations, indeed, the FMC does not even have the discretion to refuse to adjudicate complaints brought by private parties. And then the next sentence is, as a result, the United States plainly does not exercise political responsibility for such complaints, citing Alden. And Alden against Maine. Just out of curiosity, so is it your suggestion that the PTO has political responsibility for every IPR it institutes? That's awesome. Is that right? Is that your view, that we should view the PTO because it has decided, the Director decides to institute an IPR, it has political responsibility for those complaints? Is that sort of like an imprimatur of the complaint? It reflects a discretionary decision by a politically accountable actor in an executive branch agency that this proceeding should go forward. And of course, the tribe is not immune from actions brought by the United States. It's sovereign dignity. He's admitted they're not immune from re-examination proceedings at all. But there's a big difference between re-exam and inter partes review. There are certainly procedural differences, but the fact that an executive branch official has made the discretionary decision to initiate a proceeding to reconsider the agency's own decision. No, they're not reconsidering the agency's own decision. That's where you're wrong. They're reconsidering the petitioner's petitions. That's what SES makes clear. The agency's decision was one of patentability as a whole. Are they allowed to reconsider patentability as a whole, as part of an IPR? No. The answer is no. Correct? They're allowed to reconsider the claims? Yes, you're correct. No, they're not. They're allowed to consider patentability based only on the grounds raised in the petition after SES. So that's not patentability. Yeah, but that's effectively reconsideration of a decision. No, that's reconsideration of one issue of patentability. It's not reconsideration of patentability. There could be many issues of patentability that ought to render these claims invalid, but the agency would normally be permitted to do all of those in a re-exam, well, not even a re-exam, in a normal prosecution. But they can't in an IPR, can they? It is not a full reconsideration of every aspect of the decision, but it is a reconsideration of part of the decision that they made. And this brings me to the second point. But there are other features here also. IPR is not necessarily commenced by someone who has an interest, the kind of interest that would lead to the commencement of a litigation in district court. It could be anybody. Anybody can initiate an IPR, right? That's right, Your Honor, and that's an important point. It can be initiated by somebody who does not have Article III standing. And once it's initiated, they can drop out. And the question was asked about how does that compare to civil litigation. And I think the answer was that judgment can be entered against a plaintiff who drops out. In fact, if the plaintiff drops out, judgment must be entered against them because there's no longer a case for controversy. But here, of course, the party doesn't have to pursue it. Once it's initiated, the director and the board can decide to proceed. And so that further illustrates that what's really going on here is an agency action, reconsidering a prior agency action. But still, at the end of the day, the agency is acting as a referee throughout the IPR proceeding. Let me get to that. In some respects, but in the sense that's relevant to the analysis of the immunity question, this is an agency not adjudicating a private dispute between private parties, not, as Oil States tells us, a matter that from its nature would be the subject of a suit of common law. It's a second look at the agency's administrative decision. And when the IPR ends, the only thing that can happen to the patentee is the cancellation of the public franchise that they were issued by the agency in the first place. So there's not... I don't understand what you keep saying. It's a second look at patentability. The only thing that the director can do in an IPR is review only and limited to the precise grounds articulated in the petition. So it's not a redo of patentability. It's adjudication of particular issues and arguments raised by one party. Well, the second look concept wasn't mine. It's what the Supreme Court said in Quozo and reaffirmed in Oil States. And it is a narrowly focused look. But neither Quozo nor Oil States addressed the director's discretion the way SAS did. SAS is the heart of the director's discretion. And Justice Gorsuch makes it clear he has only the smidgen of discretion. And that's whether the Institute or not. But your argument is that smidgen is enough. Enough to get us into the land of waiver of tribal immunity. That's right. The petitioner gets to frame the question. But it's up to the director to decide whether or not to answer it. And the director can choose not to answer it at all. And if he does decide that he wants to answer it, then the reason that there's a proceeding involving the tribe's patent is not that they've been hailed into court by a private party. It's that a politically accountable official at an executive branch agency has made a decision. The director having to answer, it's not the same as institution. That's what you do mean, right? The director can institute or not institute? Right. And so by making that decision, he decides whether or not he's going to answer the question posed by the petitioner. He can say, you know, I'm not going to institute. And I'm not going to take another look at patentability. And if he does that, then there is no proceeding. So I thought I heard St. Regis say, concede that the tribe is not immune from ex parte re-exams. Does that help your case? And if so, how? Well, it does. And certainly there are procedural differences between them. But on the key reasons, the reasons that they are correct to make that concession apply equally here. And that is that it's a process that begins with a discretionary decision of the executive branch official and ends only with the cancellation of a public franchise, not with monetary or injunctive relief of the sort that would be entered by a court. And so what the tribe's position here really amounts to is that they have the sovereign prerogative to assert immunity to shield their public franchise from reconsideration by the federal sovereign that issued it. So in the IPR, you have only one remedy at play, right? That's right. You say that, but what about estoppel? I mean, you know, the person who brings an IPR has something to lose as well. The right to have an Article III tribunal adjudicate not only the particular validity claim that the PTO has picked up, but anything that person could reasonably have brought at the time they brought the IPR. So the person on the other side does have something to lose. You framed it as though they don't. You framed it as though all that there is here to be lost is the patent by the tribe. But the person who brings an IPR does have something to lose. In this case, for example, you could lose the right to have an Article III tribunal adjudicate not just these issues, but all issues. Well, that's certainly true, Your Honor. But there's nothing the tribe has identified or that I'm aware of in the law of sovereign immunity that would suggest that that should give them a greater prerogative to be free from the proceeding, the fact that it potentially burdens us in some way. But it's another way, though. Isn't it another indicia of the fact that this is an adversarial proceeding akin to civil litigation where both parties have something at stake, unlike a grant of patent or a reexamination, where there isn't an ex parte reexamination, there isn't the same stake? Well, in some cases the petitioner can have something at stake, but I think a key point here is the one that Judge Dyke raised earlier, which is that the petitioner doesn't have to have Article III standing. They may not be somebody who do. But you do, and there is a litigation here. Well, we do, but the Supreme Court has never, so far as I'm aware, suggested that the immunity question should be determined by the nature of the proceeding, not the particular private entity that happens to be involved in it. And the nature of this proceeding is it's one that was meant to, as much as possible, replace civil litigation's need to resolve validity issues by taking them back to the ex parte agency. So it was meant to be a substitute for civil litigation. Now, Congress opened the door broader than that. Surely they did, and that maybe makes a difference in this case. But it was meant at heart to be that. But regardless, I mean, that is one way to characterize the purpose of it. Well, if that's true, if it is, if you look at it, it's replacing civil litigation. In this case, the tribe commenced the civil litigation, which is then being continued in the IPR. So you would think maybe there's a case for waiver there. Indeed there is, Your Honor, and we have argued that here. And that is another basis for affirming the board's decision. So you think that if a tribe waives its right to sovereign immunity in one forum for an issue, it's waived its right to sovereign immunity in all forums? Not necessarily. But the test that this court has applied is that waiver is not necessarily limited to the same proceeding. But it turns on the potential for unfairness and inconsistency. Well, what case are you referring to? Vascoff says that. But that's the same proceeding. Well, and Regents of the University of New Mexico refers to the fairness and consistency. Well, biomedical suggests that it's conduited the same proceeding. The question is whether you view an IPR that grows out of a district court litigation as in some sense a continuation of that proceeding, which is what there has been some suggestion about in the history of the statute. Yeah, that's right. And I think that is certainly one way to view it. And that is an appropriate way to view it here because the tribe has brought an action to enforce the patents. It's invoking the benefits of the patent system and at the same time trying to assert its immunity to bar another aspect of the very same system at the same time involving the same patents. Most of the waiver jurisprudence lies between a party and the state. But there is a strong presumption against waiver of tribal immunity, isn't there? Unless it's been expressly expressed. I mean, unequivocally expressed. There is also a strong presumption against waiver of state. Where in this situation has that type of expression been? The conduct amounting to the waiver is the bringing of the action in the Eastern District of Texas. And there is, with respect to state immunity, also a strong presumption against waiver. If there was some sort of potential waiver, if the tribe had brought a civil litigation, and then in an IPR, a concept that I'm finding very difficult to fathom, but if there was such a thing, wouldn't cases like Kroll and Masonet v. Robles, which come from the regional circuits, cut against that notion? Because both cases say when a tribe steps in or a state sovereign steps in to a litigation, this is civil litigation, steps in as the person who assumes the rights and owns the property, and they step in, even though if a litigation was started by someone who didn't have immunity, the tribe and or the state can then assert immunity midstream, mid-litigation, to end the whole thing. So why wouldn't that scenario play out similarly here with regard to your notion of waiver? There are a couple of distinctions there, and picking up on Masonet v. Robles, the First Circuit case in particular, in that case and in the other cases that the tribe is relying on, the transfer was from an entity that had a fairly close relationship to the state, to a state agency. It was not a complete stranger to the transaction coming along and purchasing the right that was the subject of litigation. But the first entity did not have immunity. And only when the second entity became the effective owner of the interest was the ability to assert immunity permitted, and it was in fact permitted midstream, mid-litigation. That's right, but my point is that there was a pre-existing relationship. It was not purely a sale of immunity. They're not circumvention cases. That's right. Well, that goes to the sham issue. That's a totally different issue than waiver, isn't it, from a legal standpoint? It is a separate issue, but I was identifying that as one distinction that I think is important to bear in mind here. How? I don't see how, as a legal matter, that bears anything on waiver. Well, going back to waiver, so Maisonette Robles specifically identified and distinguished a case in which an Indian tribe purchased real property that was already the subject of litigation and suggested that in that case, and that was a case where the court had found that there was a waiver of immunity in purchasing the property that was already subject to litigation. And so the court treated that as a different scenario, and that is much closer to what we have here, where the litigation had commenced in the eastern district of Texas. The IPR proceeding had not only commenced but was a week away from the oral hearing, and then the tribe came in purportedly purchasing the patents subject to all of that and is now asserting immunity. And I think one can characterize that as circumvention, or one can equally say that that's conduct that amounts to a waiver. But I think both of those are valid ways of looking at it. Okay. I think we're about out of time. Thank you. Thank you, Mr. Miller. Now we've got Mr. Freeman. Thank you, Your Honor. May it please the Court, Mark Freeman for the United States. Mr. Freeman, are you familiar with where we dropped off? Because I didn't want him to sit down, but Judge Dyke told him to. So are you familiar with where we just left off? Yeah, I'm happy to have you continue the question. Can we make him come back up? I'm happy to step back. Are you familiar with the cases we were just talking about? Well, we've not pressed a waiver theory, Your Honor. So the point that we were here this morning to address is the ground in which the Supreme Court upheld this entire scheme, facing arguments very similar to those addressed by my friend today. Because the only point I wanted to remind him of, I know this is your time and I promise you'll get it. It's the Court's time. Trust me. You'll get your time. Was that the lease, the purchase agreement in the Mason-Robles case said that it was subject to the pending litigation. So the actual contract spelled that out. There you go. All right. Thank you, law clerk. Go ahead. I want to begin with the premise in which the Supreme Court upheld inter partes review, which is that it is the reconsideration of the government's decision whether to grant a public franchise. That is the express ground on which the Court upheld the proceeding against arguments exactly like those advanced by my friend today, namely that inter partes review is just private civil litigation transplanted into a federal agency. These are our proceedings. He didn't say that it's simply civil litigation. I mean, I thought that he took what felt to me like a very honest approach of it being a hybrid, but it fell on the side of one or the other. I mean, anybody that stands up in this court and says it's all of one or all of the other has no credibility because it's clearly not. The Supreme Court has made it clear. How do you reconcile oil states and SAS? They came out on the same day. They did, Your Honor. Not written by the guy who wrote the dissent in the other one. I agree. And I think my friend put it the right way. The right way to reconcile oil states and SAS Institute is that under the statute, the way Congress drafted the scheme, the petitioner gets to frame the question. The petitioner gets to say, if you want to reconsider the patent in my case, somebody else can petition in their case and frame the question differently. But if you're going to take my question, here's the question I want you to answer. And the director has unreviewable discretion whether to decide to answer that question. He can say, no, I'm not going to answer that. Somebody else come along and ask a different question. And furthermore, if he says yes, and this is a point that we didn't quite get to in the previous arguments, he can keep going with the proceeding, even if the parties want him to stop. And then when he issues a decision, what comes out is not like in Federal Maritime Commission, personal remedies specific to the plaintiff. That was a reparations order. What comes out is a certificate issued by the director of the U.S. Patent and Trademark Office under Section 318. Does that really make a big difference that in an IPR, the sole remedy is focused on the patent itself, not on any type of damages or sanctions or reparations? I think that underscores what the reasons why the Supreme Court concluded in oil states that what these proceedings are are reconsiderations of the government's decision to grant the patent in the first place. And just to look at that certificate that comes out. I mean, basically that's what the IPR is supposed to do. Yes, and what comes out at the end is a certificate issued by the agency charged with administering the federal patent laws that either amends or cancels or affirms the claims of an issued patent. And that certificate is good against the world at large. It is not a personal remedy to the petitioner. It is a public regulatory act of the United States government. And no Indian tribe has a sovereign right to prevent the United States government from making that public regulatory act. Why isn't that enough? I mean, why isn't it enough to say that an IPR is not a suit, a suit in law? Absolutely. And all the other questions just fall by the wayside. They do, Your Honor, and actually on that point, just to underscore it, the Supreme Court in oil states said if we had to pick an analogy, the analogy was a petition to the old English Privy Council to cancel a patent that had been issued. Now, nobody would think that just because the petition to the Privy Council in colonial or pre-colonial England was begun by a petition by a private party that it was the private party's cancellation of the patent. It was the English Crown's cancellation of the patent. And for the same reasons, what is happening here is the United States Patent and Trademark Office's decision to reconsider whether it granted the patent in the first place. We have political accountability. Do district courts also have the right to cancel a patent? If they conclude at the end of a litigation it should be canceled? As a defense to a patent infringement action, yes, Your Honor. No, no, no, no, no. They don't cancel the patent. Exactly. They do not cancel the patent. What they declare is that the claim was invalidly granted. And to your point, it is true that now in the world of blonder tongue, the remedies look similar in some general high-level sense, but they're not. Because after all, you have to have standing to bring a declaratory judgment action. You have to have a concrete Article III case or controversy to get in a district court. What you don't have to have is that sort of controversy to get in front of the U.S. Patent and Trademark Office. Because this is our decision for which we are accountable, it is an action of the United States government against which an Indian tribe does not have sovereign immunity. And for that reason, we would urge the Court to hold that the Board correctly said this proceeding can proceed. In antitrust litigation, my recollection is from the Supreme Court cases that in order to cancel a patent, that it has to be brought at the instance of the United States. Is my recollection about that correct? I think that is correct. I'm not going to vouch for sure. I mean, we know that particularly before the 1952 Patent Act, in the era of Univis Lenz and some of those early antitrust cases involving patents, that the claims are typically brought affirmatively by the United States, just like in the Atlantic Telephone Telegraph case where the United States brought the action to cancel the telephone patent. And the point we make in our brief, of course, is that if a private petitioner came to the government and said, please file a civil action to cancel this patent held by an Indian tribe, there would be no immunity objection to that. Of course we can do that. And it wouldn't change the fact if we were told by Congress when a private party does that, you must accept the claims they bring to you or not. It would still be the government's petitioner. How do you distinguish this case from FMC? Because it's just not the case that because it's conducted within an administrative tribunal, they automatically have no immunity. Of course. Or that would fly in the face of FMC. Of course. And you keep harping on the idea that if this were in civil litigation, it would be one thing, but because it's here, it's another. Why? Tell me the difference between this and FMC. So there are three critical differences between this and FMC. But the one I'll begin with is the point that my friend touched on as well, which is the Supreme Court in FMC placed special emphasis on the fact that the commission had no ability to turn down a non-frivolous claim complaint. It was called a sworn complaint under the statute there, brought before the agency. They had to adjudicate it. And if the party didn't show up, the state didn't show up, they'd enter a default judgment. And the court connected that to an important principle in immunity law, which is political accountability. The court said, look, what Congress has effectively done here is placed in the hands of private parties the political accountability for imposing liability on a state, and that is impermissible. But the court went on to say, of course, that the commission itself could have brought the very same proceeding, or furthermore, that it could have done so at the behest of a private party. The fact that everyone agrees in this case, the director of the Patent and Trademark Office, could simply say, no, we're not taking your case. We're not instituting review on any patents held by Indian tribes. The fact that we could do that means that if we decide to do so, it is our choice. We are politically accountable for it. We own that. When we cancel the claims, we own that decision, just like we own the decision to issue them in the first place. It is not hailing into court at the behest of a private party. It is a petition to the director to exercise his unreviewable discretion to institute a USPTO reconsideration. Does a PTO have the type of jurisdiction that it looks like it exercised in declaring statutes to be unconstitutional? To declare statutes to be unconstitutional? I'm not aware that this court has addressed that question. The Supreme Court in Elgin versus Department of the Treasury, as the court knows, addressed a similar question with respect to the Merit Systems Protection Board and said that there, although the board had declined to address the constitutionality of the selective service system, that it was unclear why the board couldn't have addressed that question. In other administrative cases, I'm thinking, for example, the Lucia versus SEC case in the Supreme Court at the moment, administrative agencies regularly do address whether the statute violates the constitution on its face. If we're speaking in constitutional terms, I think we know the answer. That's what oil state said. It said this proceeding is constitutional precisely because it involves the reconsideration of the agency. That's my point. The Supreme Court said that. Yes. And said it on a particular ground. And this goes back to a point you made, Judge Moore. Our point is not that because it involves public rights, inter partes review necessarily doesn't implicate immunity. Presumably, the Federal Maritime Commission case also involved public rights. Otherwise, it couldn't have been adjudicated in an agency. But can't it be wound up as part of the decision making? Can't the decision making be a combination of the nature of the proceeding and the nature of the right at stake taken together in this weird hybrid universe that leads us to this conclusion about cyber immunity that you want us to have, tribal immunity? I mean, couldn't it be a combination of the two? Or do you really think the nature of the right is not relevant to the analysis? It's not that I think it's not relevant to the analysis, but let me put it this way. There are some types of proceedings that simply by their nature do not implicate the immunity of a domestic sovereign. And the Supreme Court addressed that in a case cited in some of the amicus briefs called Tennessee Student Assistant Corporation versus Hood, 2004 decision by Chief Justice Rehnquist. And the question there, that involved a bankruptcy proceeding where a student tried to discharge debt held by a state. And the state said, sovereign immunity. And what the Supreme Court said was, no, look, the nature of bankruptcy, and the court had held for many years that states can be subject to bankruptcy proceedings. And they said, it didn't matter that those proceedings were adversarial in nature. It didn't matter, to your question earlier, the state or the petitioner had something to lose by having an estoppel-like effect, by having brought the claim in the first place. The point was, in bankruptcy, the states just didn't have an immunity objection to raise. And so the adversarial nature of the proceeding was irrelevant. I think the same thing is true here. If you just imagine that Congress enacted the very same scheme and said, except the day before the patent, the USPTO issued the patent, right? And so Milan comes in and says, wait, I have expert declaration. I have prior art. You're about to make a mistake, USPTO. Don't issue this patent to an Indian tribe. Now, in point of fact, the application was filed by Allergan. Let's suppose it was filed by the Indian tribe. I don't think anyone would think that the Indian tribe would have a sovereign immunity right to prevent the USPTO from hearing that evidence, even if it was preceded on an adversarial basis. Now, we know from oil states that all that interparties review is, is that very same question conducted after the patent issued, and that there's nothing talismanic about the fact that the grant date came before it. Before you sit down, tell us what your position is on the circumvention issue. We framed the circumventions. We have not addressed a sort of antitrust-like circumvention or sham argument. What we've done is defend what the board said with respect to the actual, who is the actual patent owner here, and thus the proper respondent in the USPTO proceeding. We think for all the reasons given by the board, we can all kind of recognize a shell game when we see one, and what's really going on is that Allergan remains, for all practical purposes, the patent owner, and it can defend the proceeding. But the point I'd like to leave the court with is, if you don't address the threshold question of immunity in this case, you're going to have it in another case or one after that, because people will just write their contracts differently. And, in fact, you already have pending, as the court is undoubtedly aware, a case posing the same question involving 11th Amendment immunity. We think the right way to dispose of this case and to provide guidance for the court and the parties and the bar and the agency is to explain that interparties review is the agency's reconsideration of a decision everyone agrees it's entitled to make in the first place and simply does not implicate the immunity of domestic sovereigns. Okay. Thank you, Mr. Freeman. Thank you. Mr. Massey, we'll give you seven minutes instead of three. Thank you, Your Honor. That's very generous. We do not disagree that the PTO has the authority to reconsider the grant of a patent. The question is the means by which it does so. We concede that it could proceed by reexamination. We concede the United States could file an IPR and there would be no tribal immunity. But if the means selected to accomplish the reexamination or reconsideration objective resembles a private adjudication as in FMC, then there is sovereign immunity. And FMC was a public rights case, as my friend acknowledges. FMC involved docking rights at public ports. You could imagine the agency making the same arguments. In fact, it did make exactly these arguments before the Supreme Court, saying our decisions do not implicate sovereign immunity because we need to be able to decide how to implement rules regarding docking at public ports, which are quintessential public rights. If we make a mistake, we need to reexamine them. They said this in the U.S. Supreme Court. We use private complaints as an investigatory tool to understand how to make our policies. All of these arguments were made. And what the Supreme Court said was if you use an adversarial adjudication between private parties, it will trigger sovereign immunity. I asked your opponent a question concerning the authority of the PTO to declare the statute unconstitutional. What I meant was the authority to adjudicate or to issue a decision with respect to tribal immunity. Is it your view, yes or no, whether the PTO has authority to decide that question, have an issue? Yes, it should have recognized that there was tribal immunity. As we see the system working from now on, the director, when he gets or he or she gets an IPR that's named, that's directed at a sovereign. Yes, yes. The director would then treat it as an ex parte reexam. That's how we think the process should work. If the director deems that there is a substantial new question of patentability, then the director should commence an ex parte reexam. That would be a simple way of having the system operate. I don't think that the remedies, there was discussion of the remedies making a difference because in the remedy situation, I'm sorry, in the IPR situation, the PTO is issuing a certificate and so on. The FMC is very clear that the kind of remedy issued is irrelevant. In FMC, there was essentially no remedy because the commission in that case couldn't enforce its own order. And so the dissent goes on at length about, well, the attorney general would have to bring the lawsuit. There's no sovereign immunity. You're running out of time. Yes. What would focus, if you want me to discuss the institution, the director's decision to institute, I think Judge Moore was absolutely correct that the SAS case means that the petitioner frames the issues and the PTAB can't make a decision outside those issues. This time, can I actually ask my question instead of having you answer one that you made up in your head? I'm sorry, yes. So you're running out of time, but what I really want to know is how you respond to them. I mean, I think the strongest argument that both the attorneys on the other side made is the argument about the director having discretion here, similar to the one you're making. In FMC, the court did explain that this specialized agency procedure, the director doesn't have the discretion, much like in civil litigation. It didn't have the discretion to say no. Right. That seems like a powerful point. Well, the director had the same power in interferences in Vascath and could say no. The director could declare there wasn't an interference and it was the same check. Vascath said it still triggered sovereign immunity. Also, I point out the sentence immediately prior to the one my friend on the other side quoted to you in the FMC decision. On the same page of 764, it says, the prosecution of a complaint filed by a private party with the FMC is plainly not controlled by the United States, but is controlled by that private party. The only duty assumed by the FMC, and hence the United States, is to assess its merits in an impartial manner. And then it goes on to say, in fact, they don't even have to institute. Well, that sentence that I just read is exactly the SAS point about IPRs. The IPR is controlled by the private party, not by the director. The director makes the decision to institute, but then doesn't have political responsibility, as Your Honor said. The director is not putting the imprimatur of the United States on one side or the other. I think the other point to make is that even before the director institutes, the IPRs begin in a significant way. The RPX decision, which I'll mention, it was IPR number 2015-750, is an example where even before the director instituted, the PTAB heard discovery disputes and issued sanctions on the real party in interest question. But I think the discretion whether to institute or not does not affect the overall scope and nature of an IPR as a private party, a case brought by a private party, framed by a private party. If the petitioner drops out, the other side pointed out, the IPR can still continue. But the PTO solicitor does not take over the prosecution of that claim. And as I pointed out before, precisely the same thing happened under FMC. Let me ask you, you said something that's just sticking in my head and I can't figure out the answer. Did you tell me that in interferences, the director has the discretion not to conduct an interference? No, they have to declare it. The procedure is, well, there's an application. The private party can submit, can suggest an interference. And then under 135, the director had to declare the interference. That is a, I'm just saying all of these instances. It's not discretionary. Well, it depends on. That's completely unlike IPRs. Okay. Well, none of this, all I'm saying is none of these is like a civil lawsuit. They are all different from a civil lawsuit. That's not the relevant comparison. The relevant comparison is the adjudicatory process in FMC. And that process was adjudicatory in the same way that this is. The exception of the director's discretion looks like, it looks like it's a difference, but it isn't a difference that makes a difference. And if you also, I think that the court actually exaggerated the extent of the director's discretion or underestimated. If you looked at, as I mentioned before, Section 1710B, which is the section governing the FMC proceeding, the director did have discretion in how to commence an investigation. But when you get down to the, when you get down to the resemblances, the overall purpose of the proceeding is not determinative. The means by which Congress directed IPRs to proceed, that resembles the same adjudicatory process as in FMC and also as in BASCAP. Okay. Thank you, Mr. Amanci. Thank you, all counsel. The case is submitted. That concludes our session today. All rise.